# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOSEPH J. WATLEY,

    Plaintiff,

    v.

PIKE COUNTY, *et al.*,

    Defendants.

NO. 3:17-CV-1539

(JUDGE CAPUTO)

## MEMORANDUM

Presently before me is the Motion for Summary Judgment (Doc. 12) filed by Defendants Pike County (the "County"), Pike County Correctional Facility ("PCCF"), and Sergeant Joseph Rametta ("Rametta") (collectively, where appropriate, "Defendants").[1] Plaintiff Joseph Watley ("Watley") claims that Defendants violated his rights under the Fourth and Fourteenth Amendments to the United States Constitution when he was subjected to a recorded strip search at PCCF in May 2016. Because Defendants did not violate Watley's constitutional rights, the motion for summary judgment will be granted and judgment will be entered in favor of Defendants.

## I. Background

Watley was arrested by the Pennsylvania State Police on May 11, 2016 and charged with three traffic violations. (*See* Doc. 13, "Defs.' SMF", ¶ 1).[2] The

---

[1]     Rametta is incorrectly identified as Sergeant "Ranetta" in the Complaint. (*See* Doc. 1, ¶ 4).

[2]     Local Rule 56.1 requires that a motion for summary judgment be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. Pa. L.R. 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issue for trial. *See id*. Both parties filed Rule 56.1 statements. (*See* Defs.' SMF,

Pennsylvania State Police brought Watley before a magisterial district judge. (*See id.* at ¶ 2). Watley was committed to PCCF after he did not post the collateral imposed by the magisterial district judge. (*See id.* at ¶¶ 2-3). Collateral was ordered because Watley "refused to accept traffic citation and refused to answer Trooper's questions. Def. lives out of state in CT and car is registered in Indiana. He indicated he has money to pay in his car." (*Id.* at ¶ 4 & Ex. "A", 10-12). Watley was subsequently ordered released from PCCF by the magisterial district judge on May 12, 2016. (*See id.* at ¶ 5).[3]

When Watley arrived at PCCF, Pennsylvania State Police troopers informed Sergeants Norman and Rametta that Watley was a sovereign citizen that does not communicate with law enforcement. (*See id.* at Ex. "A", 33). A nurse was summoned to the sally port in an attempt to communicate with Watley, but Watley remained silent and refused to answer any medical questions. (*See id.* at 33). Watley was "thoroughly patted down" and escorted into PCCF. (*Id.*). Watley was given a second pat down and placed in intake cell 3 with no issues. (*See id.*).

Corrections Officer Forshay offered Watley his meal, but he did not respond. (*See id.* at 60). Forshay reported at that time that Watley stated something to the

---

*generally*; Doc. 19, "Pl.'s SMF", *generally*). Several paragraphs of Watley's opposition "den[y] as stated" the corresponding paragraph in Defendants' statement. These denials, however, are often nonresponsive to Defendants' factual statement and do not deny the substance of those paragraphs. Insofar as the denials are not responsive to Defendants' factual statements, they can properly be deemed undisputed by virtue of Watley's failure to comply with Rule 56.1. *See Kobrick v. Stevens*, No. 13-2865, 2017 WL 3839945, at *1 n.3 (M.D. Pa. Sept. 1, 2017). Similarly, Defendants' factual averments that are not accompanied by record citations are not considered in resolving the instant motion. (*See* Defs.' SMF, ¶¶ 35-38); *see also* M.D. Pa. L.R. 56.1 ("Statements of material facts in support of . . . a motion shall include references to the parts of the record that support the statements.").

[3]    Watley also commenced a separate action in this Court against three (3) Pennsylvania State Police Troopers. *See Watley v. Felsman*, No. 16-2059, (M.D. Pa. Oct. 13, 2016), ECF No. 1.

effect that "time is ticking" or "the clock is ticking." (*See id*. at 33, 60). Watley disputes that he made this statement. (*See* Watley Dep., 32:21-33:12). Rather, he remained silent through the whole process. (*See id*. at 33:2-10).

Physician Assistant Volpe and a nurse were instructed to enter Watley's cell and attempt to communicate with him. (*See* Defs.' SMF, Ex. "A", 33). Watley did not communicate and remained silent. (*See id*.). Volpe's notes provide, in part:

> He had refused to talk to anyone since here, refused to sign forms or speak with the nurse or get vitals taken or give any info. I went to intake area, went in to his cell accompanied by the nurse. We both attempted several times to get him to speak with us and told him he would be put on a L 1 watch and in a suicide smock if we could get nothing from us to make any reasonable judgments about him. He rolled over laying with face toward the wall and refused to acknowledge us in any way after that.

(*Id*. at Ex. "A", 32). Volpe placed Watley on Level 1 suicide watch. (*See id*.).

A criminal history check of Waltey was conducted through a service called JNET. (*See id*. at Ex. "A", 31). That search revealed Watley had a prior assault conviction. (*See id*. at 30; *see also* Rametta Dep., 15:24-16:8).

Forshay completed a PCCF "Criteria for Unclothed Search Form on New Commitments" for Watley. (*See* Defs. SMF, Ex. "A", 30-31). That form states: "[i]f the Commitment IS NOT convicted or sentenced, proceed with the following criteria to determine if an unclothed search is applicable. Identify specific factors which establish reasonable suspicion that the Commitment poses a weapon, evidence of a crime, controlled substances or other contraband." (*Id*.). The first criterion applicable to Watley was "[t]he criminal history of the Commitment; (reasonable suspicion will ordinarily exist for an individual with a felony or misdemeanor conviction involving violence, weapons, illegal contraband, illegal substance or predatory behavior. State facts to support: prior convictions for assault." (*Id*.). The second criterion found for an unclothed search of Wately was "Commitment has a known history of suicide attempts/threats or current thoughts/ideations; State facts to support: Inmate was placed on a Level 1 suicide watch per medical." (*Id*.).

3

Watley was given the opportunity to consent and cooperate with an unclothed search. (*See* Defs.' SMF, ¶ 22; Pl.'s SMF, ¶ 22). He refused. (*See id*.; *see also* Defs.' SMF, Ex. "A", 48).

Rametta, a supervisor on duty when Watley was brought to PCCF, approved the unclothed search. (*See* Defs.' SMF, ¶ 23; Pl.'s SMF, ¶ 23). Rametta approved the search for two reasons. (*See* Rametta Dep., 15:24-16:14). First, Rametta did "a background check on Mr. Watley, and a prior conviction for assault appeared on his background, so that automatically grants us the right to give him an unclothed searched based on the fact that he has a prior 'felony or misdemeanor conviction involving violence, weapons, illegal contraband, illegal substance, or predatory behavior,' so he's automatically granted an unclothed search for that reason." (*Id*.). Second, an unclothed search was authorized because Watley was placed on suicide watch. (*Id*.).

Staff reported to Watley's cell. (*See* Defs.' SMF, Ex. "B").[4] Watley refused requests to stand, and he remained in his bunk. (*See* Defs.' SMF, ¶ 41). Watley also refused to walk to bulk storage. (*See id*. at ¶ 42; *see also id*. at Ex. "B"). Watley was then lifted and escorted into bulk storage. (*See id*.). There, he was asked to give officers his clothing so he could be placed in a safety smock. (*See id*.). Watley did not respond or remove his clothing. (*See id*.). Watley, while seated, had his shirt removed by staff. (*See id*.). Watley was then instructed to remove his pants. (*See id*.). He did not comply, and he was lifted to his feet and his pants and underwear were removed for him. (*See id*.) Watley was then placed in a suicide smock. (*See id*.). Watley was non-combative but passively resistant during this encounter. (*See id*.). The officers did not examine Watley's genitals or buttocks, but they were visible to the officers. (*See* Defs.' SMF, ¶ 44; Pl.'s SMF, ¶ 44). No contraband was located. (*See* Rametta

---

[4]     Exhibit "B" to Defendants' factual statement is a video recording of the interaction between PCCF staff and Watley in cell 3 and in bulk storage.

Dep., 28:17-19). Watley was escorted back to cell 3. (*See* Defs.' SMF, Ex. "B").

These events, *i.e.*, the escort to bulk storage, the undressing of Watley, and his return to cell 3, were recorded on a hand held body camera. (*See* Defs.' SMF, ¶ 46; Pl.'s SMF, ¶ 46). Either Rametta or Norman made the decision to record the search. (*See* Rametta Dep., 27:14). Although the policy is that inmates are only recorded from the waist up, the recording briefly displays Watley unclothed below his waist. (*See id*. at 27:15-24; *see also id*. at Ex. "B").

Watley has little recollection of the events that occurred at PCCF, recalling only "general things." (*See* Watley Dep., 28:24-41:2). Watley does not remember what happened when he was first brought to PCCF, whether he was requested to sign any forms, or whether he was searched when he arrived. (*See id*. at 29:2-19). He also does not recall being asked whether he intended to hurt himself, nor does he remember being examined by Volpe. (*See id*. at 31:4-24). Watley also has no memory of whether he was asked to consent to an unclothed search. (*See id*. at 32:17-20). Watley does not know if he was offered any meals or drinks while at PCCF, but he knows he did not eat or drink while he was there. (*See id*. at 33:25-34:20). Watley further is unaware of whether he was informed that he was going to be placed on suicide watch. (*See id*. at 34:23-35:1). Watley does not remember how he got back to his cell after the search. (*See id*. at 39:8-13).

Watley does recall that he was strip searched at PCCF not long after he was at the facility, but he does not know the exact time it occurred. (*See id*. at 35:14-16). He also remembers that after he was carried out of his cell and all of his clothing was taken off, he "was wrapped up in some sort of a binding outfit and then put back into the cell that way." (*See id*. at 30:19-22, 37:17-38:1). Watley knows that an officer was holding a video camera at that point, but he does not remember if any words were spoken. (*See id*. at 38:2-5). He also remembers that he did not speak a word that night. (*See id*. at 32:24-25). Watley additionally recalls an officer making a derogatory comment after he was bound up in the smock. (*See id*. at 36:21-37:7). He

does not recall it exactly, but he remembers a "snickering, humiliating type of thing." (*Id*. at 40:17-18).

During his time at PCCF, Watley was never placed in general population and he did not share a cell with any other inmates. (*See* Rametta Dep., 26:2-12). Watley testified that he remembered being in a cell alone. (*See* Watley Dep., 35:2-5).

In its Standard Operating Procedures, PCCF has a policy governing "Inmate/Detainee Searches." (*See* Defs.' SMF, Ex. "A", 23). That policy provides:

> The Pike County Correctional Facility will conduct the least intrusive pat searches and unclothed searches when necessary and appropriate of individuals committed to or housed in the Facility. They will be conducted by trained security staff. The purpose of these searches will be to minimize the introduction, circulation, and use of contraband in the Facility and to create a safe and secure environment for staff, inmates/detainees and visitors. The Pike County Correctional Facility recognizes that the use of these searches may, under certain conditions, be necessary to protect the safety of staff, civilians, and inmates/detainees; to detect and secure evidence of criminal activity; and to safeguard the security, safety, and related penological interests of this facility. It is the policy of the facility that such searches shall be conducted only with proper authority and justification, and in accordance with the procedural guidelines for conducting such searches as set forth in this policy. Body cavity searches must be performed by a Licensed Physician at a hospital; at no time will staff be authorized to conduct a body cavity search.

(*Id*.). Under the policy, an "unclothed search" means:

> A search during which an inmate is required to remove or rearrange some or all of his/her clothing to permit the visual inspection of any or all skin surfaces, including genital areas, breasts, and buttocks or anus for the purpose of discovering the existence of any weapons, evidence of a crime, controlled substances or other contraband. Such a search includes the visual inspection of the inmate's/detainee's body cavities.

(*Id*.). A "pre-trial inmate/detainee" is "[a]n individual, subject to incarceration/detention, who is charged but not convicted of a criminal offense." (*Id*.).

When presented with a new commitment, the policy provides that "[t]he 'Criteria for Unclothed Search Form on New Commitments' and 'Consent to Unclothed Search Form' will be completed to determine if an unclothed search is

6

applicable." (*Id*. at 25). "Unclothed searches will only be authorized in accordance with strict guidelines which will enable staff to articulate if there is individualized reasonable suspicion and documentation for the necessity of such search." (*Id*.). After the Criteria for Unclothed Search Form on New Commitments is completed, the Shift Commander reviews that document and conducts a criminal history check on JNET to determine if an unclothed search is approved. (*See id*.).

The policy further sets forth the following criteria for determining whether a pre-trial detainee should undergo an unclothed search:

> 1. The circumstances of the arrest; (verbal or physical threats, aggressive behavior while in custody of the arresting agency or know history of violence).
>
> 2. The nature of the criminal charges pending against the inmate/detainee (drug charges, crimes involving violence, weapons or predatory behavior, fleeing or known history of escape).
>
> 3. The criminal history of the inmate/detainee (reasonable suspicion will ordinarily exist for an individual with a felony or misdemeanor conviction involving violence, weapons, illegal contraband, illegal substance or predatory behavior).
>
> 4. Institutional history of the inmate/detainee (including history of use of violence or illegal contraband, including illegal substances).
>
> 5. Cannot verify whether the inmate/detainee has a criminal or institutional history due to lack of identity documents or possession of multiple or fraudulent identity documents.
>
> 6. The appearance and demeanor of the inmate/detainee (signs of recent alcohol/drug use, gang affiliation, verbal or physical threats, aggressive behavior).
>
> 7. The inmate/detainee has a known history of suicide attempts/threats or current thought/ideations.
>
> 8. Detection of contraband or other suspicious objects on or underneath the inmate's/detainee's clothing during pat search.
>
> 9. Any other reasonable suspicion based upon specific circumstances that lead the Correctional Officer to suspect that the inmate/detainee is concealing weapons, evidence of a specific crime, controlled substances or other contraband.

(*Id*. at 27). According to Rametta, while PCCF did not have a blanket policy on

7

searching inmates arriving at the facility, ninety-five percent (95.00%) of people that come to the prison receive unclothed searches. (*See* Rametta Dep., 8:1-20, 9:25-10:2)).

Rametta also testified that PCCF had a policy of videotaping "anything out of the ord - - anything out of the ordinary needed to be videotaped." (*Id*. at 10:3-17). Rametta, however, was not sure where this policy was documented, and he testified that it may have been contained in a policy besides that governing "Inmate/Detainee Searches." (*See id*.). The "Inmate/Detainee Searches" policy does not reference the use of a video camera to record strip searches. (*See* Pl.'s SMF, ¶ 48). Defendants have not submitted any of PCCF's additional Standard Operating Procedures reflecting a policy for recording anything "out of the ordinary." (*See* Defs.' SMF, *generally*).

Based on these events, Watley commenced this action. (*See* Doc. 1, *generally*). The one-Count Complaint asserts claims against Pike County, PCCF, and Rametta for "Unlawful Search and Seizure[;] Violation of the Fourth and Fourteenth Amendment[s;] Violation of State Constitution." (*See id*.). Defendants timely answered the Complaint. (*See* Doc. 6, *generally*).

Following the close of discovery, Defendants filed the instant motion for summary judgment seeking entry of judgment in their favor on all claims in this action. (*See* Doc. 12, *generally*). Watley timely opposed the motion, (*see* Doc. 18, *generally*), to which Defendants replied. (*See* Doc. 20, *generally*). The motion for summary judgment is thus fully briefed and ripe for disposition.

## II. Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A court may grant a motion for summary judgment if, after it considers all probative materials of record, with inferences drawn in favor of the non-moving party, the court is satisfied that there are no genuine issues

of material fact and the movant is entitled to judgment as a matter of law." *Chavarriaga v. N.J. Dep't of Corrs.*, 806 F.3d 210, 218 (3d Cir. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S. Ct. 2548, 2556, 91 L. Ed. 2d 265 (1986); *Brooks v. Kyler*, 204 F.3d 102, 105 n.5 (3d Cir. 2000)). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law. A dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)). "In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter . . . ." *American Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 587, 581 (3d Cir. 2009) (citing *Anderson*, 477 U.S. at 248-49, 106 S. Ct. 2505).

The moving party bears the initial burden to identify "specific portions of the record that establish the absence of a genuine issue of material fact." *Santini*, 795 F.3d at 416 (citing *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548, 2553. If this burden is satisfied by the movant, the burden then "shifts to the nonmoving party to go beyond the pleadings and 'come forward with specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)). The nonmovant's burden is not satisfied by "simply show[ing] that there is some metaphysical doubt as to the material facts." *Chavarriaga*, 806 F.3d at 218.

### III. Discussion

Watley contends that Defendants Pike County, PCCF, and Rametta violated his rights under the United States and Pennsylvania Constitutions. With respect to Watley's claims against PCCF and those pursuant to the Pennsylvania Constitution, Defendants seek summary judgment because: (1) prisons are not "persons" subject to suit within the meaning of 42 U.S.C. § 1983; (2) Watley has not identified how his rights were violated under the Pennsylvania Constitution; and (3) Pennsylvania does

not recognize a private right of action for money damages for violations of its Constitution.  (*See* Doc. 14, 14).  Watley did not respond to these points in his summary judgment opposition.  (*See* Doc. 18, *generally*).  As such, Watley has abandoned his claims against PCCF, as well as those claims for purported violations of the Pennsylvania Constitution.  *See*, *e.g.*, *Manning v. WPX Energy Appalachia, LLC*, No. 12-646, 2015 WL 3972609, at *5 (M.D. Pa. June 30, 2015) ("A Plaintiff abandons a claim when they fail to respond to defendants' arguments for summary judgment as to that claim."); *see also Boomer v. Lewis*, 541 F. App'x 186, 192 (3d Cir. 2013) ("PCCF, itself, to the extent Boomer was suing the facility, is not a 'person' within the meaning of 42 U.S.C. § 1983."); *Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*, 442 F. App'x 681, 687 (3d Cir. 2011) ("No Pennsylvania statute establishes, and no Pennsylvania court has recognized, a private cause of action for damages under the Pennsylvania Constitution.").  Judgment will be entered in favor of Defendants on these claims.

The question remaining is whether the County and Rametta are entitled to summary judgment on Watley's claim that he was searched in violation of the Fourth and Fourteenth Amendments to the United States Constitution.  The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.[5]

Watley's Fourth Amendment claim, as framed in the Complaint and refined in his brief in opposition to the motion for summary judgment, implicates several issues, including that: (1) his claim is not barred by *Florence v. Board of Chosen Freeholders of County of Burlington*, 621 F.3d 296 (3d Cir. 2010) ("*Florence I*"), *aff'd*, 566 U.S.

---

[5]     "The Fourteenth Amendment extends Fourth Amendment protections to searches and seizures by state officials."  *Parkell v. Danberg*, 833 F.3d 313, 324 n.6 (3d Cir. 2016) (citing *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 147 (3d Cir. 2005)).

318, 132 S. Ct. 1510, 182 L. Ed. 2d 566 (2012) ("*Florence II*"); (2) Defendants did not have reasonable suspicion to video the search; (3) videoing the search was unreasonable and constituted an exaggerated response to security concerns; and (4) the search was unconstitutional because it amounted to a violation of Defendants' own policy. (*See* Doc. 18, *generally*).[6]  These points will be addressed in detail below.

## A.  *Florence.*

In *Florence*, the Third Circuit considered "whether it is constitutional for jails to strip search arrestees upon their admission to the general population." *Florence I*, 621 F.3d at 298.  There, the plaintiff was arrested based on an outstanding bench warrant charging him with a non-indictable variety of civil contempt. *See id*. at 299. The plaintiff was taken to a county jail where he was "directed to remove all of his clothing, then open his mouth and lift his tongue, hold out his arms and turn around, and lift his genitals.  The officer conducting the search sat approximately arms-length in front of him, and directed [the plaintiff] to shower once the search was complete." *Id*.  Six days later, the plaintiff was transported to a county correctional facility, where, upon arrival, "he and four other detainees were instructed to enter separate shower stalls, strip naked and shower under the watchful eyes of two corrections officers. After showering, [the plaintiff] was directed to open his mouth and lift his genitals.

---

[6]     In Waltey's summary judgment submissions, he contends that he was subjected to a "strip search." (*See*, *e.g.*, Doc. 18, *generally*).  Watley testified that he was "strip searched," (Watley Dep., 35:16-16), and Rametta at his deposition testified regarding the "strip search." (Rametta Dep., 27:7-16).  Defendants in their reply dispute the classification of the search at issue as a "strip search," noting that officers did not examine Watley's genitals or buttocks, but instead disrobed him quickly and placed him in a suicide smock. (*See* Doc. 20, 6-7).  Watley admits that his buttocks and/or genitals were not examined during the search. (*See* Defs.' SMF, ¶ 44; Pl.'s SMF, ¶ 44).  The term "strip search" is "imprecise" as it is frequently used to describe a variety of conduct.  See *Florence II*, 566 U.S. at 325, 132 S. Ct. 1510.  In the matter *sub judice*, there is no evidence of "any touching of unclothed areas by the inspecting officer[s].  There [is] no [evidence] that the detainee[ ] here [was] touched in any way as part of the searches." *Id*.

Next, he was ordered to turn around so he faced away from the officers and to squat and cough." *Id*. The plaintiff was given prison-issued clothing, visited by a nurse, and sent to general jail population until his release the following day when the charges against him were dismissed. *See id*. The plaintiff filed suit, challenging the strip procedures at the two prisons as violative of his constitutional rights under the Fourth Amendment. *See id*. The district court found that the "blanket strip searches of non-indictable offenders, performed without reasonable suspicion for drugs, weapons, or other contraband, are unconstitutional." *Id*. (quotation, citations, and alteration omitted).

A divided Third Circuit panel reversed. *See id*. at 311. In so doing, the Third Circuit rejected the argument that "blanket searches are unreasonable because jails have little interest in strip searching arrestees charged with non-indictable offenses." *Id*. at 308. The court observed that the Supreme Court's decision in *Bell v. Wolfish*, 441 U.S. 520, 99 S. Ct. 1861, 60 L. Ed. 2d (1979) "explicitly rejected any distinction in security risk based on the reason for detention." *Id*. (citing *Bell*, 441 U.S. at 546, n.28, 99 S. Ct. 1861). The court also noted that "*Bell* did not require individualized suspicion for each inmate searched; it assessed the facial constitutionality of the policy as a whole, as applied to all inmates at [the correction center]." *Id*. (citing *Bell*, 441 U.S. at 560, 99 S. Ct. 1861). Lastly, the Third Circuit pointed to the Supreme Court's repeated emphasis that courts are to defer to the policy judgments of prison administrators. *See id*. at 310 (citations omitted). Accordingly, balancing the prisons' "security interests at the time of intake before arrestees enter the general population against the privacy interests of the inmates," the court held that the strip search procedures at issue were reasonable. *Id*. at 311.

A petition for writ of certiorari was filed to the Supreme Court, presenting the question of "[w]hether the Fourth Amendment permits a jail to conduct a suspicionless strip search of every individual arrested for any minor offense no matter what the circumstances." The Supreme Court granted certiorari. *See Florence v. Bd. of*

*Chosen Freeholders of Cty. of Burlington*, 563 U.S. 917, 131 S. Ct. 1816, 179 L. Ed. 2d 772 (2011).

Justice Kennedy, writing for the 5-4 majority, explained the controversy as "whether every detainee who will be admitted to the general population may be required to undergo a close visual inspection while undressed." *Florence II*, 566 U.S. at 322, 132 S. Ct. 1510. In "addressing this type of constitutional claim," the Court said that "courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security." *Id*. at 322-23, 132 S. Ct. 1510. The Court found that the plaintiff failed to present "substantial evidence" demonstrating prison officials' response to the situation was "exaggerated." *Id*. at 330, 132 S. Ct. 1510.

The Supreme Court specifically rejected the plaintiff's contention that "there is little benefit to conducting these more invasive steps on a new detainee who has not been arrested for a serious crime or for any offense involving a weapon or drugs . . . unless they give officers a particular reason to suspect them of hiding contraband," *id*. at 334, 132 S. Ct. 1510, finding it reasonable for "correctional officers to conclude this standard would be unworkable." *Id*. The Court observed that the offense of arrest is a poor predictor of dangerousness; there is often inaccurate or incomplete information about each new detainee to classify them by current and prior offenses; and officers would "encounter serious implementation difficulties" trying to make those assessments under "the pressures of the intake process." *Id*. at 334-37, 132 S. Ct. 1510. In view of these concerns, the Court held that the jail's blanket search policy "struck a reasonable balance between inmate privacy and the needs of the institutions." *Id*. at 339, 132 S. Ct. 1510.

The policy at issue here is not a blanket strip search policy, *per se*. (*See* Defs.' SMF, Ex. "A", 23-29). Nonetheless, the record indicates that ninety-five percent (95.00%) of people that come to PCCF receive unclothed searches. (*See* Rametta Dep., 8:1-20, 9:25-10:2); *cf. J.B. ex rel. Benjamin v. Fassnacht*, 801 F.3d 336, 338 n.4

(3d Cir. 2015) (policy requiring the completion of an "Unclothed Search Checklist" to determine whether a new detainee should be strip searched was not a blanket strip search policy, *per se*, but the record showed that "in all practice, all new detainess are strip searched"). Whether viewed as a blanket policy or not, the PCCF inmate/detainee search policy is constitutional under *Florence* insofar as it pertains to all detainees admitted to the general population. *See Florence II*, 566 U.S. at 339, 132 S. Ct. 1510.

Watley, though, takes the position that he fits within an exception to the Supreme Court's holding. He also argues that the search was unreasonable. Those points are taken in turn.

**B.**   ***Florence* Exception.**

The Supreme Court in *Florence* left open the possibility of an exception to its holding. *See Florence II*, 566 U.S. at 338-39, 132 S. Ct. 1510.[7] Therein, the Court observed that the matter at hand did not require it "to rule on the types of searches that would be reasonable in instances where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with other detainees." *Id*. Such accommodations, the Court cited, "may diminish the need to conduct some aspects of the searches at issue." *Id*. at 339, 132 S. Ct. 1510. But, given the circumstances before the Court, it did not have the opportunity "to consider a narrow exception of the sort Justice Alito describes [in his concurrence], which might restrict whether an arrestee whose detention has not yet been reviewed by a magistrate or other judicial officer, and who can be held in available facilities removed from the general population, may be subjected to the types of searches at issue here." *Id*.

Although he joined the *Florence* majority, Justice Alito wrote separately "to emphasize the limits" of the Court's holding that "jail administrators may require all

---

[7]     Justice Thomas, however, did not join this portion of the majority opinion. *See Florence II*, 566 U.S. at 321, 132 S. Ct. 1510.

arrestees *who are committed to the general population of a jail* to undergo visual strip searches not involving physical contact by corrections officers." *Id.* at 340, 132 S. Ct. 1510 (Alito, J., concurring) (emphasis in original). Justice Alito underscored, however, that the Court did "not hold that it is *always* reasonable to conduct a full strip search of an arrestee whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population." *Id.* at 341, 132 S. Ct. 1510 (Alito, J., concurring) (emphasis in original); *see also id.* at 342, 132 S. Ct. 1510 (Alito, J., concurring) ("The Court does not address whether it is always reasonable, without regard to the offense or the reason for detention, to strip search an arrestee before the arrestee's detention has been reviewed by a judicial officer. The lead opinion exlicitly reserves judgment on that question.").[8]

Watley argues that his circumstances fit within the exception left open by the Supreme Court. Watley notes that he was never placed in general population and he did not have contact with other detainees while housed at PCCF. (*See* Doc. 18, 4-6). Thus, he insists that "this case fits squarely in the *Florence* exception allowing the claim to move forward." (*Id.* at 4).

> Courts have struggled to decipher Justice Alito's concurrence and its impact on the majority's holding that correctional officers may require all detainees who are assigned to the general population to undergo a strip search. In line with Plaintiffs' argument, some courts in this circuit "have [ ] interpreted *Florence* as embracing an exception - albeit one whose precise contours are undefined at this point and time." *Haas v. Burlington County*, 955 F. Supp. 2d 334, 342–43 (D.N.J. 2013). However, other courts have expressed doubts whether Justice Alito actually created an exception. *See Crump v. Passaic County*, 147 F. Supp. 3d 249, 255-56 (D.N.J. 2015) ("Concurring, Justice Alito emphasized the limits of the Court's holding"); *Moore v. Atlantic County*, No. 07–5444, 2015 U.S. Dist. LEXIS 33160, at *26, 2015 WL 1268184 (D.N.J. Mar. 18, 2015) (referring to Justice Alito's concurrence as the "so-called *Florence* 'exception'

---

[8]    Chief Justice Roberts joined the majority opinion, and like Justice Alito, explained that "the Court does not foreclose the possibility of an exception to the rule it announces." *Florence II*, 566 U.S. at 340, 132 S. Ct. 1510 (Roberts, C.J., concurring)

> "); *Conner v. Mastronardy*, No. 13-3034, 2014 U.S. Dist. LEXIS 66854, at *9-10, 2014 WL 2002350 (D.N.J. May 15, 2014) ("Justice Alito noted in his concurrence that the holding in Florence was limited" and was simply a "reservation of issues"). Indeed, Justice Alito stated that his concurrence only "emphasize[s] the limits of today's holding." *Florence*, 566 U.S. at 340 (Alito, J., concurring). While the Third Circuit has not directly addressed whether Justice Alito's concurrence created an exception to the majority's holding, the court advised that Justice Alito "emphasized the narrowness of the Court's holding" and left open the possibility that a blanket strip search policy may not always be constitutional. *Parkell*, 833 F.3d at 330 n.11; *see Fassnacht*, 801 F.3d at 341.

*Bizzarro v. Ocean Cty.*, No. 07-5665, 2017 WL 2119450, at *11 (D.N.J. May 16, 2017).

To the extent that such an exception exists, Watley's circumstances do not satisfy it. The so-called *Florence* exception outlined by Justice Alito exists only if two circumstances are true: (1) the arrestee's detention has not yet been reviewed by a judicial officer; and (2) the arrestee can be held apart from the general population. *See Florence II*, 566 U.S. at 341, 132 S. Ct. 1510 (Alito, J., concurring); *see also In re Nassau Cty. Strip Search Cases*, 639 F. App'x 746, 751 (2d Cir. 2016). It is undisputed that Watley was detained after he saw a magisterial district judge who ordered his detention because "there are reasonable grounds to believe that the Defendant will not appear for future appearances." (*See* Defs.' SMF, Ex. "A", 10-12). Thus, insofar as Justice Alito's concurrence delineates an exception to the Supreme Court's holding in *Florence*, the requirements are not met here.

## C. Reasonableness.

Waltey fails to demonstrate a violation of his Fourth Amendment rights. The Fourth Amendment "grants inmates a limited right of bodily privacy, subject to reasonable intrusions necessitated by the prison setting." *Parkell v. Danberg*, 833 F.3d 313, 324-25 (3d Cir. 2016). But, while the Fourth Amendment "applies to bodily searches in prison," the "contours of prisoners' Fourth Amendment rights" are "very narrow." *Id*. at 326. Application of the Fourth Amendment requires balancing of

interests. *See id*.

> "The test of reasonableness under the Fourth Amendment . . . requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell*, 441 U.S. at 559, 99 S. Ct. 1861. "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id*. Inmate search policies are constitutional if they "str[ike] a reasonable balance between inmate privacy and the needs of the institutions." *Florence II*, 132 S. Ct. at 1523.
>
> In balancing those interests in the prison context, we must give considerable weight to the "place in which [the search] is conducted" - prisons being "places of involuntary confinement of persons who have a demonstrated proclivity for antisocial criminal, and often violent, conduct," *Hudson* [*v. Palmer*, 468 U.S. 517, 526, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984)], and considerable deference to "the justification for initiating it." *Bell*, 441 U.S. at 559, 99 S. Ct. 1861. "[C]orrectional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Florence II*, 132 S. Ct. at 1517. A regulation "impinging on an inmate's constitutional rights must be upheld if it is reasonably related to legitimate penological interests." *Id*. at 1515 (quotation marks omitted). We recognize that "[t]he task of determining whether a policy is reasonably related to legitimate security interests is peculiarly within the province and professional expertise of corrections officials." *Id*. at 1517 (quotation marks omitted). Unless there is "substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment in such matters." *Id*. (quotation marks omitted).

*Id*.

With respect to the scope of the search, while Watley characterizes it as a "strip search," this term, for reasons explained before, lacks precision. In particular, while Rametta authorized an unclothed search, the actual search of Watley involved him being nude for a brief period before four male officers. Watley was not touched by the officers (other than to hold him up because he refused to do so himself), was not inspected at a close or uncomfortable distance, did not have his genitals or buttocks examined by officers, (*see* Defs.' SMF, ¶ 44; Pl.'s SMF, ¶ 44), was not directed to move or spread his buttocks or genital areas, or to cough in a sitting or squatting

17

position. Video of the events confirm that Watley was viewed while he was naked for, at most, two to three minutes. (*See* Defs.' SMF, Ex. "B").

The manner in which the search was conducted was also reasonable. Watley was repeatedly given the opportunity to undress himself. Without response, officers removed Watley's shirt while he was seated. He was then given the chance to remove his pants himself, and after he again refused to acknowledge the officers, he was lifted to his feet and his pants and underwear were removed and a safety smock was placed over him.

There was also a significant justification for the search. Watley was non-responsive to officers at PCCF, which was similar to his behavior before he arrived at the facility based on the description from the Pennsylvania State Police. Waltey refused to answer questions from PCCF staff regarding whether he posed a danger to himself.[9] As a result, he was placed on suicide watch by medical staff. On these facts, it was not unreasonable for Rametta to authorize an unclothed search of Watley in light of concerns for staff and Watley's own safety.

Finally, the location of the search supports a finding of reasonableness. Watley was carried from his cell to the bulk storage room where he was undressed after refusing orders to do so himself. There, he was changed out of view of other inmates and staff.

Balancing the need for the search against Watley's privacy rights, the search authorized and conducted was reasonable. Officers were presented with a passively

---

[9] There is a dispute of fact as to whether Watley stated something to the effect that "the clock is ticking." For purposes of the present motion, I accept as true Watley's testimony that he did not make such a statement. *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) ("where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true."). He does not dispute that he did not answer questions from medical staff as to whether he would hurt himself, nor does he dispute that he was placed on Level 1 suicide watch.

resistant, non-responsive inmate that was virtually catatonic. Watley refused to comply with (or even acknowledge) basic questions and instructions. Safety concerns, both for officers and Watley himself, were understandable when Watley refused to respond to questions, including whether he had an inclination to harm himself. The officers' actions here were reasonable, and Watley's claim that their conduct was an exaggerated or unjustified response is unconvincing. The search did not violate the Fourth Amendment.

That the search was recorded does not save Watley's claim or render the search unconstitutional. Using a camera to record a strip search in a prison does not, by itself, amount to a constitutional violation. *See*, *e.g.*, *Davis v. Florence*, 600 F. App'x 26, 27 (2d Cir. 2015) ("the defendants showed that their practice of having a supervisory officer present during strip frisks and recording strip frisks via wall-mounted video camera is reasonably related to the legitimate interests in both inmate and staff security at Sullivan."); *Henderson v. Oats*, No. 17-155, 2018 WL 2054563, at *2 (W.D. Ky. May 2, 2018) ("'the Court finds that Plaintiff's allegation that he was strip searched in a drunk tank with a camera fails to establish a violation of his constitutional rights."); *Bellamy v. City of New York*, No. 16-772, 2017 WL 979064, at *3 (S.D.N.Y. Mar. 13, 2017) ("While he does mention that the search was conducted in a room with a security camera, there is no basis to find that the presence of a camera, by itself, was unreasonable. Indeed, the presence of cameras may assist prisoners by ensuring that government officials do not abuse prisoners while conducting searches."); *Sanchez v. Bauer*, No. 14-CV-02804, 2015 WL 5026195, at *6 (D. Colo. Aug. 26, 2015) (finding allegation that the plaintiff was "video recorded" while he was strip searched failed to state a Fourth Amendment claim); *Smith v. City of New York*, No. 14-5934, 2015 WL 3929621, at *2 (S.D.N.Y. June 17, 2015) ("neither the presence of cameras nor the presence of other inmates and employees of a correctional facility makes an otherwise constitutional strip search unconstitutional."); *Peek v. City of New York*, No. 13-4488, 2014 WL 4160229, at *2

19

(S.D.N.Y. Aug. 18, 2014) ("Without more, however, the presence of a camera at a strip search does not amount to a constitutional violation."). Cases finding constitutional violations when a strip search is recorded involve factual circumstances not present here, for example, when officers of the opposite sex record or view the search. *Cf. Baggett v. Ashe*, 41 F. Supp. 3d 113, 122 (D. Mass. 2014) ("the strip searches of class members in this case, to the extent they occurred with male officers in the immediate vicinity conducting videotaping, were unreasonable regardless of whether the officers actually viewed the inmates. Plaintiff's Fourth Amendment rights were violated by the mere presence of a male officer nearby conducting the videotaping during her strip search.").[10]

For reasons explained above, it was reasonable for Rametta to authorize an unclothed search and for officers to undress Watley when he refused to do so himself. The recording of these events does not alter this conclusion. Indeed, PCCF staff acted reasonably in determining that it was appropriate to record this search. They were presented with a non-responsive, passively resistant inmate that had been placed on suicide watch. The video recording served various legitimate penological needs in the matter *sub judice*, such as ensuring that the search was conducted in a proper manner, deterring against misconduct and false accusations of misconduct, and providing an objective record of the events. The search of Watley and the recording of same was not unreasonable.[11]

---

[10]  There are no record facts suggesting that female officers participated in or were present when Watley was undressed. (*See* Defs.' SMF, Ex. "B").

[11]  I do not consider Rametta's qualified immunity defense in disposing of the instant motion. Although pled as an affirmative defense in this action, (*see* Doc. 6, ¶ 5), Defendants did not raise qualified immunity in their brief in support of their motion for summary judgment. (*See* Doc. 14, *generally*). While it was mentioned in their reply brief, (*see* Doc. 20, 12), "issues raised for the first time in a reply brief supporting summary judgment are deemed waived because the opposing party typically does not have the opportunity to respond." *Sloan v. Murray*, No.

Watley also suggests that he presents a viable claim for trial because Defendants' actions amounted to a violation of PCCF policy. (*See* Doc. 18, 2, 8-10). More particularly, Waltey argues that Defendants' policy did not require a pretrial detainee to be strip searched if on suicide watch, and the policy did not require that the search be recorded. (*See id*.). Watley further emphasizes that an easy alternative existed to the decision to search him, namely that he could be observed via a surveillance camera in his cell and by way of visual monitoring which was required every fifteen (15) minutes. (*See id*. at 8).

Defendants' alleged violation of PCCF policy does not make Watley's claim. Assuming, as Watley argues, that PCCF policy was violated by prison staff, this by itself does not mean that a constitutional deprivation occurred. Just as a state's compliance with its own policy is not determinative of the constitutional inquiry, *see Williams v. Secretary Pennsylvania Department of Corrections*, 848 F.3d 549, 565 (3d Cir. 2017), failure to adhere to a prison policy does not alone amount to a constitutional violation. *See Tennile v. Quintana*, 443 F. App'x 670, 672 n.2 (3d Cir. 2011) ("a violation of prison regulations in itself is not a constitutional violation."); *Lyons v. Beard*, No. 07-2278, 2010 WL 890009, at *4 n.6 (M.D. Pa. Mar. 8, 2010) (Vanaskie, J.) ("a failure to adhere to state policy does not by itself establish a federal constitutional violation."); *see also Samford v. Dretke*, 562 F.3d 674, 681 (5th Cir. 2009) ("a prison official's failure to follow the prison's own policies does not, itself, result in a constitutional violation."); *Whitman v. Nesic*, 368 F.3d 931, 935 n.1 (7th Cir. 2004) ("the mere fact that state rules or statutes are violated does not in and of itself amount to a constitutional violation or give rise to an actionable § 1983 claim."); *Cole v. Bone*, 993 F.2d 1328, 1334 (8th Cir. 1993) ("under section 1983 the issue is whether the government official violated the Constitution or federal law, not whether

---

11-994, 2017 WL 3495190, at *5 n.4 (M.D. Pa. Aug. 10, 2017) (citing *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 139 n.8 (3d Cir. 2017)).

he violated the policies of a state agency.").  Any violation of PCCF policy, to the extent one occurred here, did not deprive Watley of his constitutional rights, so he cannot survive summary judgment on this basis.

Finally, Watley argues that "*Monell* liability exists since [he] was searched pursuant to local government SOP 1012.6, Inmate/Detainee Searches." (Doc. 18, 10-12).  But, *Monell* liability cannot exist in the absence of an underlying constitutional violation.  *See Grazier v. City of Phila.*, 328 F.3d 120, 124 (3d Cir. 2003) (disallowing liability on a failure to train theory where a jury determined that the underlying conduct did not violate a plaintiff's constitutional rights); *see also Mulholland v. Gov't Cty. of Berks*, 706 F.3d 227, 238 n.15 (3d Cir. 2013); *Mills v. City of Harrisburg*, 350 F. App'x 770, 773 n.2 (3d Cir. 2009).  Given that Watley's underlying constitutional claim fails for reasons explained before, he cannot demonstrate that the County is liable under *Monell*.

## IV. Conclusion

For the above stated reasons, Defendants' motion for summary judgment will be granted.  Judgment will be entered in favor of Defendants on all claims.

An appropriate order follows.

November 16, 2018
Date

/s/ A. Richard Caputo
A. Richard Caputo
United States District Judge